CONNOR, J., dissenting.
The judgment of the court below is as follows:
"This cause coming on to be heard at the April Term, 1932, of this court before his Honor, Cameron F. MacRae, judge, presiding, and the parties having consented to waive a jury trial and agreed that his Honor find the facts and make his conclusions of law thereon, and after considering the evidence offered filed therein, the court finds the following facts:
1. That on 20 March, 1928, the directors of the Central Bank and Trust Company at a meeting duly called and held for that purpose, voted to increase the capital stock of said bank in the sum of five hundred thousand dollars ($500,000), and to increase the surplus of said bank in the sum of five hundred thousand dollars ($500,000) by *Page 622 
issuing and selling five thousand (5,000) shares of additional capital stock at the price of two hundred dollars ($200) per share, and provided by a resolution duly passed at said time that the then stockholders of said bank should be allowed to purchase as many shares of the new capital stock as they then already held in said bank at the price of two hundred dollars ($200) per share, but fixed the price to be paid by all other purchasers who were not then stockholders at two hundred and seventy-five dollars ($275) per share; that pursuant to said resolution duly passed by the board of directors, the defendant, J. C. Martin, on 2 May, 1928, being then a stockholder in said bank and holding sixty (60) shares of its capital stock, subscribed for, purchased and paid for, sixty (60) additional shares of the new stock of said bank of the par value of one hundred dollars ($100) each, at the price of two hundred dollars ($200) per share, which amount was duly paid by said Martin at said time.
2. That the defendant, J. C. Martin, was induced to subscribe for, purchase and pay for said sixty (60) shares of capital stock by the false and fraudulent representations of W. B. Davis, president of Central Bank and Trust Company, acting on behalf of said bank, to the effect that said bank was solvent, prosperous and a successful banking institution engaged in the legitimate banking business in the city of Asheville and making large dividends; that it was honestly and conservatively managed, and was perfectly solvent and in splendid financial condition.
3. That said representations, and each of them, were untrue, false and fraudulent to the knowledge of the said W. B. Davis, acting for said bank, and were made by him with the intent to wrong, cheat and defraud the defendant, the said J. C. Martin, who on account of his long and intimate acquaintance with the said Davis and with his high standing in the community, was induced to rely upon such representations and did, in fact, rely upon the same, and on account thereof subscribed to and paid for said stock.
4. That at the time the defendant subscribed and paid for said stock, and on the date the resolution was passed by the board of directors, to wit, 20 March, 1928, and at all times thereafter, up to and including 19 November, 1930, said Central Bank and Trust Company was insolvent, and during all of said period said W. B. Davis either knew said bank was insolvent or had knowledge of such facts as would put a reasonably prudent man on notice that the bank was insolvent.
5. That during the year 1929 the defendant heard a rumor to the effect that the condition of the Central Bank and Trust Company was not good, and immediately came to Asheville and went to see said *Page 623 
W. B. Davis, president of said bank; P. R. Moale, one of its directors and a member of the finance committee, and Canie N. Brown, one of its directors and chairman of the finance committee, and told said officers and directors that he had heard this rumor from a person living in Statesville, North Carolina, and asked them, and each of them, as to the then condition of the bank; that he was assured by each of them that the rumor was untrue; that the bank was in splendid financial condition and that there was no reason to be in the least bit disturbed or uneasy as to that condition, and, relying upon the said statement of said officers of said bank, the defendant was satisfied that the bank was in no financial trouble and in no danger of any financial trouble; that the defendant relied upon the statements of said officers and was justified in relying upon said statements on account of their previous high character, business ability and reputation in the community; that again in July, 1930, the defendant, while in Asheville, had a conversation with the said W. B. Davis, who again assured him that the bank was in excellent condition and that it was in no danger whatsoever of insolvency; that the defendant received the several financial statements as to the condition of the bank issued on 30 June, 1928, 3 October, 1928, 23 March, 1930, and 24 September, 1930, set out in the statement of facts filed herein, and relied upon said statements as being correct statements of the financial condition and progress of said bank, and that the defendant exercised due diligence and care at all timesto keep in touch with the financial condition of said bank and was guiltyof no negligence or laches or other fault in connection with the receipt orthe continued holding of the stock in said bank up until the time of itsfailure, and was guilty of no negligence or laches in his failure, torepudiate the purchase of said stock prior to the failure of said bank.
6. That the defendant did not, prior to the docketing of the stock assessment judgment against him herein, repudiate his subscription to the purchase of said stock, nor did he offer to return the dividends received thereon, but that immediately after the docketing of said judgment he engaged counsel, gave notice of appeal, and attempted to repudiate the purchase of said stock, as appears from the record herein, and shortly thereafter and prior to the trial of this action offered to return the dividends which he had theretofore received on said stock, which offer and tender were declined by the plaintiff.
7. That on or about _______ February, 1931, the predecessor of the plaintiff in this action docketed against the said J. C. Martin in the Superior Court of Buncombe County, North Carolina, an assessment on the entire stock standing in his name of the Central Bank and Trust Company *Page 624 
at the time of its failure, the total amount of said judgment being twelve thousand dollars ($12,000), which assessment included the sum of six thousand dollars ($6,000) assessed on the 60 shares of stock purchased by the defendant on 2 May, 1928. That the said Martin on 6 June, 1930, by virtue of an order of the court made in this cause, paid into the office of the clerk of this court, without prejudice to his rights, the amount of said assessment levied upon the 60 shares of stock owned by him prior to 2 May, 1928, together with interest thereon, as provided by the said order of the court.
8. That at the time of the failure of the said Central Bank and Trust Company, to wit, 19 November, 1930, the defendants, J. C. Martin, was the owner of one hundred twenty (120) shares of the capital stock of the said Central Bank and Trust Company of Asheville, North Carolina, of the par value of $100.00 per share.
9. That during the entire period that the defendant owned the aforesaid stock, it paid dividends aggregating 12 per cent per annum, which dividends were received by the defendant and appropriated to his own use.
From the foregoing facts the court finds the following conclusions of law: (1) That the defendant, J. C. Martin, was guilty of no laches ornegligence in not repudiating the purchase of said stock between 2 May,1928, and 19 November, 1930. (2) That the defendant, J. C. Martin, was not guilty of laches after the failure of said Central Bank and Trust Company on 19 November, 1930, and that he took prompt action to repudiate the stock assessment against him, employed counsel, filed an answer denying liability for said stock assessment on the grounds set out in said answer and on the basis of testimony offered on the trial of this cause. (3) That it appearing from the records that the Central Bank and Trust Company, and it being admitted in open court by both parties, that defendant was a stockholder of record of one hundred twenty (120) shares of the capital stock of the Central Bank and Trust Company when said bank closed its doors on 19 November, 1930, which included sixty (60) shares of stock subscribed and paid for by him on 2 May, 1928, and that the said Martin has duly paid and discharged that portion of said assessment which was based upon the capital stock in said bank owned by him prior to 2 May, 1928. (4) The court being of the opinion that the fraudulent representations of W. B. Davis, president of the Central Bank and Trust Company, which were relied upon by the defendant at the time he purchased and paid for said stock and the other evidence and circumstances relied upon by the defendant, do not as a matter of law *Page 625 
relieve said defendant from his liability for an assessment for the stock standing in his name at the time of the failure of said Central Bank and Trust Company.
It is thereupon ordered, adjudged and decreed, that the judgment heretofore docketed in the office of the clerk of the Superior Court of Buncombe County be and the same is hereby ratified and affirmed, and it is adjudged that the plaintiff recover of the defendant the sum of six thousand dollars ($6,000), with interest thereon from 16 February, 1931.
It is further considered and adjudged by the court that the plaintiff recover of the defendant the cost of this action to be taxed by the clerk."
The questions in this case are: (1) whether or not a stockholder in a bank who has been induced to purchase the stock from the bank through the fraud of its president can set up such fraud as a defense against the statutory liability for an assessment after the insolvency of the bank, under the North Carolina statute, amendment 1927, on the subject, the stockholder being guilty of no laches. (2) Could this be done prior to the amendment of 1927? We think so.
N.C. Code of 1931 (Anno.), Michie, C. S., 218(c), 13(d), is as follows: "All sums collected under the levy shall become immediately available as general assets of the bank for distribution as other assets. Provided, however, that whenever the expenses of liquidation have been paid and all of the liabilities to depositors, and other creditors shall have been discharged, the money then remaining in the hands of the commissioner ofbanks shall be applied pro rata to the repayment of the amounts paid in bythe stockholders." (Italics ours.) Public Laws 1927, chap. 113, sec. 13(d).
In tracing this provision of the banking laws, in reference to the subject, we find, in Public Laws, 1911, chap. 25, part sec. 2: "All indebtedness due from such shareholders, or any of them, their representatives or estates, shall be payable to the said receiver as corporate assets, and the title thereto shall be vested in such receiver, to be by him applied for the equal benefit of all persons entitled to share in the distribution of the fund and disbursed ratably under the orders of the court." C. S., 240.
Public Laws 1921, chap. 4, part sec. 17, is as follows: "All expenses on account of any receivership and all wages or salaries due officers or *Page 626 
employees shall be paid out of the assets of such bank before distribution of the proceeds thereof; and such receiver may, on order of the court, make a ratable dividend of the money in his hands on all such claims as may have been proved to his satisfaction or adjudication in a court of competent jurisdiction, and as the proceeds of the assets of such bank are paid to the receiver, he shall on like orders make any further dividends, upon all claims previously proved or adjudicated, and the remainder of the proceeds, if any, shall be paid to the stockholders of such bank, or their legal representatives, in proportion to the stock respectively held by them." 3 C. S., part sec. 218(c).
The decision in Hill v. Smathers, 173 N.C. 642, is to the effect that the statutory liability of the stockholders is created exclusively for thebenefit of corporate creditors. It is not to be numbered among the assets of the corporation, and the corporation has no right or interest in it.Corporation Commission v. Bank, 193 N.C. 113. This is not so under the amended statute of 1927. When the bank stock was purchased the present statute in relation to the subject, entered into and formed a part of the contract. Bateman v. Sterrett, 201 N.C. at p. 62; Hamilton v. R. R.,ante, at p. 472.
Michie, supra, 218(c), 13, provides an easy method of assessment of stock liability which, in part, is as follows: "After the expiration of thirty days from the date of the filing of the notice of the taking possession of any bank, in the office of the clerk of the Superior Court, the Commissioner of Banks may levy an assessment equal to the stock liability of each stockholder in the bank, and shall file a copy of such levy in the office of the clerk of the Superior Court, which shall be recorded and indexed as judgments, and shall have the force and effect of a judgment of the Superior Courts of this State; and the same shall become due and payable immediately," etc. Public Laws 1927, chap. 113, sec. 13, 1931, chaps. 243, 385, 405. This statute was held constitutional inCorporation Commission v. Murphey, 197 N.C. 42.
Under the amended statute of 1927, supra, we have a new provision "the money then remaining in the hands of the Commissioner of Banks shall beapplied pro rata to the repayment of the amounts paid in by thestockholders."
Ordinarily fraud will vitiate any contract, but it has been frequently asserted that fraud cannot be precisely defined as its ramifications are so hydra-like. It is axiomatic that one who perpetrates a fraud and is enriched thereby cannot retain the fruits of his wrongdoing. So by analogy the very officer, W. B. Davis, president of the bank, who perpetrated the fraud, could, as depositor or creditor, and finally as stockholder, *Page 627 
upon the payment of this assessment, be entitled to profit by his own wrong. This is the egg which spoils the omelet. It is not possible to separate the good from the bad.
In Lee and others v. Pearce, 68 N.C. at p. 78, quoting from Adams Eq., 176, we find: "The innocence of a party who has profited by a fraud will not entitle him to retain the fruit of another man's misconduct, or exempt him from the duty of restitution."
"The beautiful character, pervading excellence, if one may say so, of Equity Jurisprudence," says Story, J., "is that it varies its adjustments and proportions so as to meet the very form and posture of each case in all its complex hibitudes." Massey v. Alston, 173 N.C. at p. 223.
The contrariety of the decisions are mainly premised on the language of the different acts, but prior to the bank act, supra; in regard to ordinary corporations this jurisdiction has settled the law contrary to plaintiff's contention.
In Chamberlain v. Trogden, 148 N.C. at p. 140-1 (1908), citing numerous authorities, speaking to the subject, the following is said: "There is some conflict of authority as to the right of a subscriber to rescind his subscription or maintain a defense to his obligation therefor on the ground of fraud after the corporation has become insolvent and its affairs have passed into the possession and control of a receiver of the bankruptcy court, or other method of general adjustment, primarily for the benefit of creditors. The English cases and some courts in this country have held that, under conditions indicated, it is no longer open to the subscriber to maintain such a defense. These English decisions, however, are said to be based to some extent on the construction given to certain legislation on the subject, and the weight of authority in this country seems to establish that, under exceptional circumstances, the subscriber may avail himself of the position suggested even after insolvency." TheChamberlain case, supra, was cited and approved in Corporation Commissionv. Bank, 193 N.C. 113.
Even if it be conceded that the amendment to the Banking Act of 1927 undertook to deal solely and exclusively with the method of distribution of special funds arising from stockholder assessments, nevertheless theTrogden case, supra, recognizes and sanctions the right of a stockholder to repudiate his stock subscription procured through the fraud of his own corporation, even after insolvency, or bankruptcy. The fact that a bank stockholder may be assessed in the event of insolvency does not alter his essential rights or obligations as a stockholder. That is to say, a bank stockholder stands upon the same footing as *Page 628 
stockholders in other ordinary business corporations except that the statute hangs a liability around his neck if his bank fails.
In Commissioner of Banks v. Cosmopolitan Trust Co., 41 A.L.R., 658, a Massachusetts case (253 Mass. 205, 143 N.E. 609), takes the view: "One subscribing to an increase of stock of a trust company cannot avoid his statutory liability to stockholders when the company becomes insolvent, because he was induced by fraud to make his subscription." In the annotation, at p. 689, citing a wealth of authorities, speaking to the subject, is the following: "The great majority of the American cases either hold directly that insolvency of the corporation does not, in and of itself, cut off the right of a defrauded stockholder to escape his liabilities as such, or else impliedly support the same rule by basing the stockholder's loss of his right to rescind for fraud upon laches or some other element of estoppel in combination with the insolvency of the corporation." People v. Cal. Safe Dep. Trust Co. (rehearing denied) (Cal.), 126 Pac. Rep., 516; Gress v. Knight, 31 L.R.A. (N.S.), p. 900, and the note there referred to; Smith v. Jones, L.R.A., 1917C., 890, 191 S.W. 500; Shufflebaum v. DeLashmutt, 83 Fed., p. 449; Newton Nat., Bankv. Newbigin, 74 Fed., p. 137; Fla. Land Improvement Co. v. Merrill, 52 Fed., 77.
Under the majority rule, the Chamberlain case, supra, is cited. In StateBank of Portland v. Gotshall, 51 A.L.R., 1200, (Oregon case,254 P. 800), the Oregon Court holds: "Fraud inducing one to purchase bank stock cannot be urged as a defense in an action under a double liability statute against the stock holders by the state superintendent of banks, upon the insolvency of the bank, since thepurpose of the statute is to protect depositors and creditors."
(Italics ours.) See Michie on Banks and Banking, Vol. 2, sec. 42(i), p. 124.
It is well settled that the injured party to rescind must act promptly and within a reasonable time after the discovery of the fraud or after he should have discovered same by due diligence. Willis v. Willis, ante, 517.
It will be observed that the question of laches, a differentiating feature in most of the cases, plays no part in the present decision. The court below found no laches on the part of defendant. The authorities on the subject are collated in a valuable annotation reported in 41 A.L.R., 674. In Commissioner of Banks v. Carrier, 202 N.C. 850, there were laches — "She should have acted with promptness and diligence."
The case of Corporation Commission v. McLean, 202 N.C. p. 77, is not decisive of this case. In the McLean case the stock sold to McLean upon which the assessment was levied was not sold him by the *Page 629 
bank, and the bank received no part of the proceeds of the purchase price. McLean bought the stock from individuals, and the fact that they happened to be officers of the bank should certainly in no way render the bank liable for the fraud which they perpetrated upon him, if any.
The court below by agreement found the facts (1) all the necessary elements that constitute fraud and deceit were practiced on the defendant to obtain the stock subscription; (2) that defendant was not guilty of laches. The record discloses that "while the defendant received certain sums as dividends on the stock referred to, he has offered to return such dividends and still stands ready to do so."
Under the amendment of 1927, if the defrauding officer be a depositor or creditor, he would participate in the distribution of the general assets, and the amendment makes specific provision for pro rata repayment to stockholders of the residue of their assessments after the payment of expenses and creditors. Hence the collection of the present assessment would swell the refund, in case of any, to the defrauding officer. This was not the intent of the Legislature. Nor was the statute amended idly or to no purpose.
The fraud perpetrated by W. B. Davis, president of the bank, on defendant under the present statute would indirectly enure to his own benefit. The Commissioner of Banks cannot recover, for by so doing it would be enriched by the perfidy of the president of the bank, it being the liquidating agent of the bank, and it would thus allow the president to take advantage of his nefarious conduct. The defendant is entitled, under the facts and circumstances of this case, to recover the $6,000, less dividends received. The judgment of the court below is
Reversed.